UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SUPPLEMENT MANUFACTURING
PARTNER, INC. d/b/a SMP NUTRA,                Case No. 2:23-cv-06585-JMA-AYS

        Plaintiff,

    -against-

WILLIAM CARTWRIGHT,

        Defendant.

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION TO HOLD DEFENDANT IN CONTEMPT

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................3

ARGUMENT ......................................................................................................7

   I.    Legal Standard for Civil Contempt.............................................................7

      A.   The Restrictive Orders at Issue Are Clear and Unambiguous ..................8

      B.   The Evidence of Cartwright's Violation of the Consent Order is Clear and

      Convincing .............................................................................................9

      C.   Cartwright Plotted and Schemed to Violate the Consent Order Before He Had Even

      Signed it ................................................................................................13

   II.   Remedies for SMP Nutra ...........................................................................14

      A.   Civil Contempt .......................................................................................14

      B.   Criminal Contempt .................................................................................19

CONCLUSION ..................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Casale v. Kelly*, 710 F. Supp. 2d 347 (S.D.N.Y. 2010) ......................................................14, 17

*CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91 (2d Cir. 2016) .........................................17

*Chere Amie, Inc. v. Windstar Apparel, Corp.*, 175 F. Supp. 2d 562 (S.D.N.Y. 2001)......14, 15

*City of New York v. Golden Feather Smoke Shop, Inc.*, No. 08-CV-3966 (CBA), 2010 WL
    2653369 (E.D.N.Y. June 25, 2010) .................................................................................8, 13

*Cricut, Inc. v. APA Tech. Co.*, No. 19CV5380RPKMMH, 2023 WL 6370866 (E.D.N.Y. Sept.
    30, 2023) ........................................................................................................................13

*Dell Inc. v. Compudirect, Inc.*, 316 F. App'x 32 (2d Cir. 2009) ..................................................9

*Giuliano v. N.B. Marble Granite*, No. 11-MD-00753 JG VMS, 2014 WL 2805100 (E.D.N.Y.
    June 20, 2014)..................................................................................................................8

*In re EZ Pay Servs., Inc.*, 390 B.R. 445 (Bankr. M.D. Fla. 2008) ...........................................18

*Kelly Toys Holdings, LLC v. 19885566 Store*, No. 22-CV-9384 (JMF), 2023 WL 4288356
    (S.D.N.Y. June 29, 2023)...............................................................................................7, 11

*Leadsinger, Inc. v. Cole*, No. 05 CIV. 5606(HBP), 2006 WL 2266312 (S.D.N.Y. Aug. 4,
    2006) ................................................................................................................................19

*N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339 (2d Cir.1989) ......................8, 14, 16

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d
    645 (2d Cir. 2004)...........................................................................................................7

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, No. 99-CV-10175 (KMW), 2021 WL 3418475
    (S.D.N.Y. Aug. 5, 2021) .................................................................................................17

*S.E.C. v. Northshore Asset Mgmt., LLC*, No. 05-CV-2192 (RO), 2006 WL 1642915, at *2
    (S.D.N.Y. June 14, 2006)................................................................................................10

*SmartSky Networks, LLC v. Wireless Sys. Sols., LLC*, 630 F. Supp. 3d 718 (M.D.N.C. 2022)

.................................................................................................................................18

*Spallone v. United States*, 493 U.S. 265 (1990)........................................................................7

*Treyger v. First Class Furniture & Rugs Inc.*, No. 21-CV-2902 (EK), 2022 WL 18356256

(E.D.N.Y. July 14, 2022), report and recommendation adopted, No. 21-CV-

2902(EK)(RLM), 2023 WL 199698 (E.D.N.Y. Jan. 17, 2023)...............................7, 8, 9, 17

*United States v. Lynch*, 162 F.3d 732 (2d Cir.1998)................................................................19

*United States v. United Mine Workers of Am.*, 330 U.S. 258 (1947) .....................................15

**Other Authorities**

Local Civ. R. 83.6(a)...............................................................................................................12

Plaintiff Supplement Manufacturing Partner, Inc. ("Plaintiff" or "SMP Nutra"), by and through the undersigned, respectfully submits this Motion to seek an order to hold Defendant William Cartwright ("Defendant" or "Cartwright") in both civil and criminal contempt for his willful violation of the Consent Order entered on November 6, 2023 (ECF No. 21).

## PRELIMINARY STATEMENT

Plaintiff SMP Nutra respectfully refers this Court to its Motion for a Temporary Restraining Order and the accompanying exhibits and declarations (ECF Nos. 4-6) for the full recital of the underlying facts predating the Consent Order. On November 6, 2023, following the Court's granting of a Temporary Restraining Order (the "TRO," ECF No. 10), several extensions, thereof, and the parties' weeks-long settlement negotiations, the Court entered the Consent Order. The Consent Order directed Defendant Cartwright to restore SMP Nutra's exclusive access and control to the company's digital accounts, and, relevant to the present Motion, enjoined him from accessing or otherwise utilizing any of SMP Nutra's proprietary information, including customer and vendor lists. *See* Consent Order, at 2–3. Cartwright has brazenly and willfully violated that Order.

Starting around mid-December 2023, contacts on SMP Nutra's Customer List – including individuals who have personal or professional relationships with SMP Nutra and are *not in the supplement business* – began receiving solicitations from "Top Tier Nutra" ("Top Tier").  Top Tier purports to be an online supplement manufacturing business operating from the website, located at <toptiernutra.com> (the "Top Tier Website"). Top Tier claims to have been in business for more than five years, yet the <TopTierNutra.com> domain name (the "Domain Name") was registered on September 28, 2023, after the entry of the TRO in this case. The registrant in the WHOIS records for the Domain Name is listed as

1

Lawrence Simon, who was the former Chief Operating Officer ("COO") of SMP Nutra from July 2021 to June 2023, and a friend of Cartwright's.

Upon investigation, SMP Nutra discovered that Cartwright had unlawfully downloaded SMP Nutra's list of more than fifty-seven thousand contacts and three hundred active customers (the "Customer List") from its customer relationship management ("CRM") platform, Hubspot, on the day that his employment with the company was terminated. Top Tier is using Hubspot – the same CRM tool previously used by Cartwright – to solicit SMP Nutra's customers, using SMP Nutra's Customer List.

Further research into the Top Tier Website revealed that it was operated by an entity called, "Ciris Labs, Inc." ("Ciris"), doing business as Top Tier Nutra. The Top Tier Website and Ciris rely on an array of online and business services that match 100% the ones that Cartwright has used in the past in connection with SMP Nutra and various business ventures. The Top Tier Website has also copied many of SMP Nutra's exact products and formulas, and continues adding to the list of copied products every day.

On November 17, 2023, Top Tier attempted to place an order with one of SMP Nutra's vendors, ███████, for creatine gummies. Certain products offered for sale by SMP Nutra – including the creatine gummies – can only be ordered from ███████ or are exclusively made for SMP Nutra. Hence, if Top Tier wants to solicit SMP Nutra's customers, it has to be able to offer them the exact same products manufactured by the exact same suppliers, using the exact same ingredients. When ███████ did not fill the order, Cartwright contacted the President of ███████, directly, and sought to meet with him in person to discuss "a few things." There is no valid reason why Cartwright would contact the owner of one of SMP Nutra's major vendors, except to try to place orders with his company – this contact evidences Cartwright's connection to Top Tier and is, of itself, a violation of the Consent Order.

The first time that Cartwright violated the TRO, he excoriated Hubspot for abiding the "bogus" TRO, and for going against: "the man who set everything up, ran Hubspot day to day and gave Hubspot tons of business." We are now supposed to believe that Cartwright – who illegally downloaded the Customer List, is not the one who set everything up, and is running Hubspot day to day, as Top Tier solicits SMP Nutra's customers using the Customer List that he stole – carrying out the very plan that he threatened in the parking garage of SMP Nutra prior to the entry of the TRO, to "take the company down."

Based on clear and convincing evidence that Cartwright violated the Consent Order by soliciting customers and vendors of SMP Nutra using SMP Nutra's proprietary information, SMP Nutra respectfully requests that the Court hold Cartwright in both civil and criminal contempt. SMP Nutra further seeks damages to compensate SMP Nutra for the theft of its Customer List, an order directing that Cartwright turn over his digital devices and Hubspot account for inspection, for and, in the alternative, for additional expedited discovery, as deemed necessary by the Court, into Cartwright's involvement in Top Tier.

## STATEMENT OF FACTS

Starting on or around December 12, 2023, contacts on SMP Nutra's Customer List received an email solicitation from Top Tier, which advertised a supplement product, "Creatine 1000mg gummies" (the "Creatine Gummies"), among other supplement products. Several contacts who reported having received the solicitation thought it odd, as they are not in the business of selling supplements, nor had they signed up for promotional emails from Top Tier. Declaration of Steven Milano ¶ 2 (the "Milano Decl."); Declaration of Brittany Milano ¶¶ 2-6 (the "Brittany Milano Decl."); Declaration of Brett E. Lewis, Esq. ¶¶ 2-6 (the "Lewis Decl."). These contacts are in SMP Nutra's Customer List because they provide business services for the company. Milano Decl. ¶ 3. In late December 2023, these contacts received another marketing email from Top Tier, promoting other supplement products.

3

Milano Decl. ¶ 4; Brittany Milano Decl. ¶ 6, Exhibit B; Lewis Decl. ¶ 6, Exhibit B. The alleged sender of the emails, Top Tier's CEO Sam Johnston, appears to be a fictitious person with a hastily created LinkedIn account. Lewis Decl. ¶ 12, Exhibit G. Although Mr. Johnston's LinkedIn profile claims that he has been the CEO of the Company for over five years, the Domain Name was registered on September 28, 2023, and the company behind Top Tier was incorporated less than one year ago. Lewis Decl. ¶ 12, Exhibit G.

The source code of the Top Tier emails reveals its connection to Hubspot. Lewis Decl. ¶ 13, Exhibit B. As stated above, Hubspot is the CRM tool used by Cartwright while he was employed by SMP Nutra. Milano Decl. ¶ 10. In Cartwright's own words, he is "the man who set everything up," and "ran Hubspot day to day." Top Tier is using the Customer List that Cartwright illegally downloaded to solicit SMP Nutra's customers and contacts using the CRM tool that Cartwright used for SMP Nutra and all of his other businesses.

Further investigation of the source code for the Top Tier Website shows that it shares similar website structure and utilizes the same services as SMP Nutra's website, located at <www.smpnutra.com> (the "SMP Nutra Website"), which was designed by Cartwright. Both websites are built using WordPress (a web content management system), Yoast SEO (a search engine optimization plug-in tool for WordPress), and Woocommerce (an e-commerce plug-in for WordPress). Lewis Decl. ¶ 7.  The underlying domain name was registered with Enom, LLC, a domain name registrar that Cartwright has used in the past to register domain names. Milano Decl. ¶ 12, Exhibit B; Lewis Decl. ¶ 8, Exhibit C. The domain name registrant is listed as Lawrence Simon, an individual who used to work at SMP Nutra, and who remains in contact, and meets up regularly, with Cartwright. Milano Decl. ¶ 6; Lewis Decl. ¶ 8, Exhibit C. Mr. Simon held the title of Chief Operations Officer between mid-July 2021 and mid-June 2023, as a contractor to SMP Nutra. Milano Decl. ¶ 6. During his time at SMP Nutra, Mr. Simon struggled to perform basic tasks using computers, and lacked the technical

skills to use the online operations systems put in place by Mr. Milano. Milano Decl. ¶ 7. Mr. Simon circumvented such systems and instead processed orders by paper. Milano Decl. ¶ 7. He was not capable of performing any tasks related to website development or e-commerce marketing. Milano Decl. ¶ 7.[1] Nor did Mr. Simon have access to SMP Nutra's Hubspot account. Milano Decl. ¶ 7. Simply put, Mr. Simon is not a person knowledgeable in the use of Hubspot, WordPress, or any of the tools or services utilized for building the Top Tier Website. Milano Decl. ¶ 7.

"Top Tier Nutra" is the assumed name for Ciris, a New York company formed on March 28, 2023. Lewis Decl. ¶ 10. Ciris adopted "Top Tier Nutra" as its assumed name on October 5, 2023, after entry of the TRO, but before the entry of the Consent Order. Lewis Decl. ¶ 10. Ciris was incorporated through Allstate Corporate Services Corp., a service that Cartwright has used to incorporate other entities. Lewis Decl. ¶ 10, Exhibit E; Milano Decl. ¶ 11, Exhibit A. The corporate certificate for Ciris lists an address of "180 E Main Street, Suite 110, Patchogue, NY 11772," which is the address for an accounting firm. Lewis Decl. ¶ 11; Exhibits E, F. The solicitation emails from Top Tier are addressed from "Sam Johnston," as CEO.  As stated above, the LinkedIn profile for Mr. Johnston appears to be fake, and falsely states that Top Tier has existed for more than five years. Lewis Decl. ¶ 12, Exhibit G.

SMP Nutra's company records show that on August 29, 2023, the day that Cartwright's employment was terminated – while he still retained wrongful access to SMP Nutra's Hubspot account –  Cartwright exported an "All Contacts" list with more than 57,000 contacts and an "Active Customer List" with 334 contacts via his email at wcartwright@getknownpros.com. Milano Decl. ¶ 13; Exhibit C. SMP Nutra adds the email

---

[1] According to his LinkedIn profile, Mr. Simon has never held a position in marketing or Web development. Lewis Decl. ¶ 9, Exhibit D.

addresses of its service providers to its All Contacts list, including the service providers solicited by Top Tier – SMP Nutra's insurance vendor and legal counsel. Milano Decl. ¶ 3.

Top Tier also contacted a supplier from SMP Nutra's vendor list – ██████. On or around November 17, 2023, Top Tier emailed ██████ to request a quote for Creatine Gummies. Milano Decl. ¶ 14, Exhibit D. The creatine gummies are the exact same ones with the exact same formulation sold by SMP Nutra to its customers, and are sold exclusively to SMP Nutra. Milano Decl. ¶ 15. ██████ responded that the Creatine Gummies were out of stock and the inquiry stopped. Milano Decl. ¶ 14.

Soon after, on January 10, 2024, Cartwright contacted ██████'s CEO, ██████ ██████, seeking an in-person meeting. Milano Decl. ¶ 16; Exhibit E. Although the text message was cryptic, the purpose was clear – Top Tier had been unsuccessful at ordering the creatine gummies it had marketed to SMP Nutra's Customer List from ██████, and now Cartwright sought to secure a source of supply. Cartwright did not have a social relationship with ██████. Milano Decl. ¶ E.  Although it would be fun to speculate as to what topics Cartwright might claim he wanted to discuss with ██████'s owner over dinner – recipes, popular fiction, bowling – it is clear that the "few things [Cartwright would] love to discuss with [██████]," were the supply of creatine and other gummies for Top Tier. Lacking a supply for the creatine gummies that Top Tier advertised to SMP Nutra's customers, Cartwright contacted ██████'s owner for an in-person meeting. It bears repeating that these gummies are exclusive to SMP Nutra and are not available from any other source. Milano Decl. ¶ 15.

As of the date of this filing, the Top Tier Website is active and is being updated on a regular basis to copy more and more of the stock products offered by SMP Nutra. Lewis Decl. ¶ 14.  It currently displays 74 products, each of which has a corresponding product on the SMP Nutra Website, and the "supplement facts" displayed for each product appears to be

an exact same copy of the one on the SMP Nutra Website – not merely the information, but the images, themselves. Lewis Decl. ¶¶ 15-18, Exhibits H, I. In other words, Top Tier is in direct competition with SMP Nutra using proprietary Customer Lists that were illegally downloaded by Cartwright, copying the exact stock products offered on SMP Nutra's Website (at lower prices), and soliciting SMP Nutra's vendors, all of which is prohibited by the Consent Order.

## ARGUMENT

### I.     Legal Standard for Civil Contempt

It is well established that "courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Spallone v. United States*, 493 U.S. 265, 276 (1990). An alleged contemnor may be held in civil contempt for failure to comply with a court order if: "(1) the order is clear and unambiguous, (2) proof of noncompliance is also clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Treyger v. First Class Furniture & Rugs Inc.*, No. 21-CV-2902 (EK), 2022 WL 18356256, at *3 (E.D.N.Y. July 14, 2022), report and recommendation adopted, No. 21-CV-2902(EK)(RLM), 2023 WL 199698 (E.D.N.Y. Jan. 17, 2023) (citing *SEC v. Durante*, 641 F.App'x 73, 76 (2d Cir. 2016)). It need not be established that the violation was willful. *See Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (citing *Donovan v. Sovereign Sec. Ltd.*, 726 F.2d 55, 59 (2d Cir.1984)). Courts may also hold a nonparty in contempt for aiding and abetting a violation of the injunction, upon a showing (1) that the party subject to the court's mandate committed contempt; and (2) that [the nonparty] assisted the enjoined party." *See Kelly Toys Holdings, LLC v. 19885566 Store*, No. 22-CV-9384 (JMF), 2023 WL 4288356, at *6 (S.D.N.Y. June 29, 2023) (citing *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002)).

Local Civil Rule of Eastern District of New York 83.6 provides the procedures to be followed to hold an enjoined party in civil contempt—a proceeding to adjudicate a person in civil contempt shall be commenced by the service of a notice of motion or order to show cause. Local Civ. R. 83.6(a); *see also Giuliano v. N.B. Marble Granite*, No. 11-MD-00753 JG VMS, 2014 WL 2805100, at *5 (E.D.N.Y. June 20, 2014) (requiring personal service, along with service of a copy of Local Rule 83.6; allowing for the recovery of a "reasonable counsel fee;" and allowing the Court to order the contemnor's arrest). The Local Rules also provide that damages and a reasonable counsel fee necessitated by the contempt proceeding may be sought to compensate the moving party. Local Civ. R. 83.6(a).

## A. The Restrictive Orders at Issue Are Clear and Unambiguous

"A clear and unambiguous order is one that leaves no uncertainty in the minds of those to whom it is addressed, who must be able to ascertain from the four corners of the order precisely what acts are forbidden." *Treyger*, 2022 WL 18356256, at *4. To be clear and unambiguous, an injunction need only "be specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir.1989); *City of New York v. Golden Feather Smoke Shop, Inc.*, No. 08-CV-3966 (CBA), 2010 WL 2653369, at *6 (E.D.N.Y. June 25, 2010) (finding clear and unambiguous use of commonly used terms in an injunction enjoining the defendants from "selling" unstamped cigarettes to "members" of an Indian tribe).

Here, the Consent Order clearly and unambiguously provides the conduct that Cartwright is prohibited from:

> "8. Unless otherwise authorized by SMP Nutra, Cartwright, his agents, officers, and employees, and all other persons and entities in active concert or participation with him, are enjoined from:
> a. Accessing, searching, disclosing, copying, or otherwise converting SMP Nutra's electronic files except as provided to Cartwright, his agents, officers, or employees in connection with alternative dispute resolution between the parties (and in

8

> such case only in connection with said alternative dispute
> resolution);
>
> b. Engaging in any activity that uses SMP Nutra's proprietary
> data that was created on or after the formation of SMP Nutra,
> including but not limited to customer lists, vendor lists, and
> pricing models; and
>
> c. Denying SMP Nutra access to the <smpnutra.com> Office
> Exchange 365 email accounts, the <smpnutra.com> domain
> name, the <smpnutra.com> website, SMP Nutra's Hubspot
> account, or any other SMP Nutra accounts[.]"

Consent Order, at 2–3. Specifically, Section 8(b) of the Consent Order explicitly enjoins

Cartwright from "engaging in **any** activity that **uses** SMP Nutra's **proprietary data**. . .

including but not limited to **customer lists, vendor lists**, and **pricing models**." *Id.* (emphasis

added). The relevant language in the Consent Order is crafted with commonly used words,

and any reasonable person should be able to understand the exact conduct disallowed by the

Consent Order—use of SMP Nutra's proprietary data. Indeed, Cartwright and his counsel

negotiated and agreed upon the language of the Consent Order. Therefore, the Consent Order

provides clear guidance for Cartwright's compliance.

## B. The Evidence of Cartwright's Violation of the Consent Order is Clear and Convincing

In the context of civil contempt proceedings, the clear and convincing standard

requires a quantum of proof adequate to demonstrate a "reasonable certainty" that a violation

occurred. *Treyger*, 2022 WL 18356256, at *4. "Clear and convincing" evidence can be

established by circumstantial evidence that is sufficient for a movant to associate the alleged

violations with the contemnor. *See Dell Inc. v. Compudirect, Inc.*, 316 F. App'x 32, 33 (2d

Cir. 2009) (affirming trial court's decision to hold the defendant in civil contempt where the

plaintiff presented circumstantial evidence to establish that the defendant continued selling

infringing products under aliases after entry of consent judgment); *see also S.E.C. v.

Northshore Asset Mgmt., LLC*, No. 05-CV-2192 (RO), 2006 WL 1642915, at *2 (S.D.N.Y.

June 14, 2006) (drawing adverse inferences from circumstantial evidence that contemnor violated a TRO based on the contemnor's strong motive to wrongfully access the plaintiff's safe deposit box and his supervision over a co-defendant to do so, even when the contemnor refused to testify on the matter).

In this case, SMP Nutra has collected strong circumstantial evidence, from which the Court may conclude that Cartwright has been actively conspiring with others to set up a competing business against SMP Nutra, using SMP Nutra's proprietary information – the very thing that he is barred from doing. First, there is no dispute that Cartwright illegally downloaded the Customer List on August 29, 2023 – the very Customer list being used to solicit SMP Nutra's customers and contacts. *See* Milano Decl. ¶ 13, Exhibit C. Top Tier solicited multiple professional services providers to SMP Nutra – companies that provide insurance and legal services, who are not in the supplement business. Milano Decl. ¶ 2; Brittany Milano Decl. ¶¶ 2-6, Exhibits A, B; Lewis Decl. ¶¶ 2-6, Exhibits A, B. This, alone, is sufficient to establish a violation of the Consent Order, but there is much more.

Second, out of the thousands of law firms and services that incorporate entities, Ciris was incorporated through Allstate Corporate Services Corp. ("Allstate") – a company that Cartwright also used to form Get Known Pros, LLC. Milano Decl. ¶ 11; Exhibit A. Allstate is not a large or well-known company, making the fact that Top Tier was incorporated by Allstate much more than a coincidence.

Third, The Top Tier Website was structured with website development tools that Cartwright used when he was employed by SMP Nutra, namely WordPress, Yoast SEO, Woocommerce, and the underlying domain name was registered with Enom LLC, a domain name registrar with which Cartwright holds a personal account. Milano Decl. ¶¶ 10-12, Exhibits A, B; Lewis Decl. ¶ . All of the tools that were used to develop Top Tier were used to develop SMP Nutra's Website. Lewis Decl. ¶¶ 7, 8, 13; Exhibits B, C.

10

Fourth, Top Tier relies on Hubspot as its CRM tool. Lewis Decl. ¶ 13; Exhibit B. Cartwright similarly used Hubspot for SMP Nutra's CRM portal, and Cartwright downloaded the stolen Customer List from Hubspot, where he has a personal account. Milano Decl. ¶ 13; Exhibit C. Moreover, Cartwright was so enraged that Hubspot granted SMP Nutra access to its Hubspot account, that he continued trying to get it back, even after the entry of the TRO. *See* Declaration of Brett E. Lewis ¶ 7 (ECF No. 15). Cartwright called the TRO "bogus," and claimed that he was "the man who set everything up, ran Hubspot day to day and gave Hubspot tons of business." It is inconceivable that Lawrence Simon – a man with no technical aptitude – is managing a Hubspot campaign using SMP Nutra's Customer List, vendor list and pricing information, or that Cartwright would allow him anywhere near Hubspot, given his penchant for control. It is clear that Cartwright is providing the stolen Customer List and marketing muscle to Top Tier.

Fifth, Mr. Simon is the listed registrant of the Domain Name. Lewis Decl. ¶ 8; Exhibit C. This indisputably makes Top Tier an enterprise comprised of SMP Nutra castoffs. Mr. Simon did not and does not have access to SMP Nutra's Customer List through Hubspot or any other sources, and there is indisputable documentary evidence that Cartwright downloaded it. Milano Decl. ¶ 13, Exhibit C.  At best, Mr. Simon is a party acting in active concert and participation with Cartwright, which makes them both subject to the Consent Order and, depending on Mr. Simon's awareness of the Consent Order, to contempt proceedings. *See Kelly Toys*, 2023 WL 4288356, at *6. The fact that Simon's name is associated with Top Tier forecloses any straight-faced argument that Top Tier is run by the mythological Sam Johnston. Indeed, the very fact that Cartwright and Simon went to the effort of hiding their identities behind a made-up figurehead is evidence of their intent to evade the Consent Order.

<u>Sixth</u>, on November 17, 2023, Top Tier contacted ███████ – one of SMP Nutra's major suppliers – to purchase the same exact creatine gummies that SMP Nutra exclusively sells. Milano Decl. ¶ 14, Exhibit D. When they were unsuccessful, Cartwright contacted ██ ██████'s owner directly, asking to meet and discuss some things. Milano Decl. ¶ 16, Exhibit E. By contacting █████████, Cartwright violated the Consent Order's prohibition against using SMP Nutra's proprietary information from the company's vendor lists. He also stepped out of the shadows and into the spotlight – asking for a meeting just weeks after Top Tier tried and failed to obtain creatine gummies from █████████ – gummies that they had already marketed for sale to SMP Nutra's customers, and which they cannot sell unless ██████ supplies them.

<u>Seventh</u>, Top Tier is undercutting SMP Nutra's pricing on supplements by exactly $1.00/bottle. Milano Decl. ¶ 18. Unless Top Tier had knowledge of SMP Nutra's pricing, it would not be able to offer the identical stock products to SMP Nutra's customers for the attention-grabbing price of $1.00/bottle less. The Consent Order explicitly bars Cartwright from using SMP Nutra's pricing information – he clearly has knowledge of SMP Nutra's prices and is using that knowledge to turbo charge his unlawful solicitation of SMP Nutra's customers.

Last but not least, Mr. Simon, the listed registrant of <toptiernutra.com>, a long-time social and business contact of Cartwright's, is not tech-savvy enough to have created a Website, or to have run a marketing campaign through Hubspot. Milano Decl. ¶ 7. Hence, the evidence overwhelmingly supports a conclusion that Top Tier and Mr. Simon aided and abetted, and remain in active concert with Cartwright, to solicit SMP Nutra's customers and vendors in violation of the Consent Order.[2]

---

[2] There is insufficient evidence of Mr. Simon's knowledge of the Consent Order at this time to hold him in contempt – it is possible that Cartwright has not informed Mr. Simon that he is subject to this Court's decree.  SMP Nutra reserves the right, however, to seek a civil

### C. Cartwright Plotted and Schemed to Violate the Consent Order *Before He Had Even Signed it*

Regarding the third element for finding civil contempt, "reasonable diligence requires a party to develop and execute reasonable effective methods of compliance." *City of New York v. Golden Feather Smoke Shop, Inc.*, No. 08-CV-3966 (CBA), 2010 WL 2653369, at *5 (E.D.N.Y. June 25, 2010). "A party does not act with reasonable diligence in obeying a court order if it 'complied reluctantly' or 'after a contempt motion had been filed.'" *Cricut, Inc. v. APA Tech. Co.*, No. 19CV5380RPKMMH, 2023 WL 6370866, at *7 (E.D.N.Y. Sept. 30, 2023).

Here, Cartwright grudgingly complied with parts of the Consent Order—restoring exclusive access and control of all of the company's digital accounts to SMP Nutra—but unknown to SMP Nutra, Cartwright had illegally downloaded and retained a copy of SMP Nutra's Customer List. *See* Milano Decl. ¶ 13. Every action that Cartwright has taken to build Top Tier into a competitor of SMP Nutra on the back of SMP Nutra's proprietary information has been in flagrant disregard of Section 8(b) of the Consent Order, while making ineffectual attempts to hide his involvement behind corporate names, WHOIS privacy services, and fake CEO's. *See* Lewis Decl. ¶ 9, Exhibit D.

Cartwright's willful disregard of the Consent Order is further exemplified by his violation of the TRO. Cartwright threatened Hubspot for not giving control of SMP Nutra's account back to him, and claimed that this Court's order was a "bogus TRO." *See* Declaration of Brett E. Lewis ¶ 7 (ECF No. 15). Cartwright's counsel attributed his actions at the time to Cartwright being emotional, and since Cartwright was unsuccessful in his efforts to violate

---

contempt finding against Mr. Simon in the event that evidence is discovered, which establishes his prior knowledge of the Consent Order. At a minimum, once made aware of the Consent Order, Mr. Simon must immediately cease and desist from all activities prohibited by such Order.

the TRO, he suffered no consequences for his actions.  Yet Cartwright was already scheming to violate the TRO and the Consent Decree again. He has no respect for court orders or the rule of law.

In addition, Cartwright has used Top Tier and/or Mr. Simon to aided and abet him in circumventing the Consent Order. Cartwright violated the Consent Order by sharing SMP Nutra's Customer List with Top Tier and Mr. Simon, with the intention of soliciting SMP Nutra's contacts through Top Tier. *See* Milano Decl. ¶ 2. Mr. Simon is clearly involved with Top Tier, as his name appears in the WHOIS records for the Domain Name, yet, both he and Cartwright have deliberately concealed their ties to Top Tier. Lewis Decl. ¶ 8.

As such, Cartwright's pattern of violating Court orders and blatant violation of the Consent Order warrant holding him in contempt. Additional discovery will be required to determine whether Top Tier and Mr. Simon should also be held in contempt as aiders and abettors of Cartwright's contemptuous conduct.

## II.       Remedies for SMP Nutra

### A. Civil Contempt

A civil contempt sanction may, as noted, serve either to coerce the contemnor into future compliance with the Court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance. *New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989).  A court may impose a fine as a contempt sanction only if "the contemnor is able to purge the contempt ... by committing an affirmative act, and thus carries the keys of his prison in his own pocket." *Casale v. Kelly*, 710 F. Supp. 2d 347, 363 (S.D.N.Y. 2010). While sanctions for civil contempt can be imposed "without a finding of willfulness," the contemnor's intent may be considered in fashioning an appropriate remedy, including attorneys' fees. *Chere Amie, Inc. v. Windstar Apparel, Corp.*, 175 F. Supp. 2d 562, 567 (S.D.N.Y. 2001). An award of attorneys' fees is appropriate only

14

where the "contemnor had actual notice of the Court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply." *Id.* (granting attorneys' fees for the prosecution of the plaintiff's contempt application where no persuasive grounds for any denial of such compensation were established).

   a. <u>Compensatory Damages</u>

  Compensatory sanctions should reimburse the injured party for its actual damages. *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947). To determine the depth of harm, Plaintiff relies on the report of a consulting expert, Centri Business Consulting, LLC (the "Centri Report"). Centri considered the costs of developing the Customer list, applied a 5.5% multiplier to account for the startup costs to create the Customer List, another 30% multiplier to account for the replacement cost of the Customer List based on the other major market participants in the supplement industry and their public reports, and then discounted the total amount by 41% to account for routine customer attrition over a period of four years. Centri determined the value of the Customer List to be around $6.4 million. *See* Milano Decl. ¶ 20, Exhibit G.

  Compensatory damages are particularly appropriate in this case, where Cartwright has demonstrated a pattern of disregarding Court orders. Even were the Court to order Cartwright to destroy all copies of the Customer List, there is no way to assure that he will do so, and, if past is prologue, he will disobey any future orders of the Court restricting his use of SMP Nutra's proprietary information. Absent an award of compensatory damages holding Cartwright fully accountable for his actions, the only lesson that Cartwright is likely to learn from getting caught – again – violating one of this Court's Orders, is to be more careful next time.  Cartwright will hide his involvement better, use a different CRM, scrub the Customer List of professional contacts, use different Web building tools and service providers, and he will violate the Consent Decree again, and whatever contempt order the Court may issue.

As such, the only recourse that SMP Nutra has against Cartwright violating the Consent Order, or selling SMP Nutra's Customer List to a competitor, is an award of compensatory damages and attorneys' fees. As a company, built primarily on its sales and marketing, the value to SMP Nutra of its Customer List, Vendor List, and pricing information cannot be overstated. The Centri Report fairly accounts for the cost and value of creating the Customer List, and discounts that value by 40%. Accordingly, SMP Nutra respectfully requests an award of $6.4 million, plus attorneys' fees.[3]

b.  <u>Coercive Sanctions</u>

Alternatively, when imposing coercive sanctions, a court should consider (1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden. *New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1353 (2d Cir. 1989). As set forth in the Centri Report, Cartwright's contemptuous conduct caused damages to SMP Nutra in the amount of $6.4 million. That loss of value would increase over time if Cartwright were not held in contempt and heightened sanctions against making use of SMP Nutra's proprietary information were not decreed. As such, Plaintiff requests coercive sanctions in the amount of $100-per-violation of the Consent Order, each violation being a solicitation that Cartwright directed or coordinated to send to a contact on SMP Nutra's Customer List. To date, Cartwright has sent at least 114,000 such solicitations, yielding a total damages award of $11,400,000.

Such punishment is proper for coercing future compliance, especially when Cartwright's behavior pattern creates a genuine concern of future non-compliance. *See CBS*

---

[3] Ironically, while Cartwright was busy violating the TRO, he was negotiating a buy-out of his shares in SMP Nutra – seeking a multi-million dollar payout from a company that he was actively trying to harm using illegally-obtained proprietary information in violation of a Court Order.

*Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 99 (2d Cir. 2016) (affirming district court's civil contempt sanctions and noting that the court's "civil contempt powers are particularly adapted to curb recidivist offenders where future noncompliance is a well-founded concern"); *see also Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, No. 99-CV-10175 (KMW), 2021 WL 3418475, at *17 (S.D.N.Y. Aug. 5, 2021) (granting coercive sanction of $20,000 per trademark infringement in violation of an injunction, which was payable to the Clerk of Court where the plaintiff made no showing of actual loss); *Casale v. Kelly*, 710 F. Supp. 2d 347, 363 (S.D.N.Y. 2010) (allowing $500 per incident violation with potential increases on the fine amount to ensure compliance in the long term, and allowing the contemnor to "purge" by ordering it to make affirmation of its intention to abide). Here, a sanction of $100-per-violation is far less than the amounts granted by courts in other cases, and is reasonable under the circumstances, where the contemnor's conduct was aimed at diverting the customers of a company that did roughly $30 million in sales in 2023.

  c. <u>Attorneys' Fees</u>

   As mentioned above, a court may grant attorneys' fees as an item of damages to the victim of contempt upon a showing of the contemnor's willfulness. *Treyger*, 2022 WL 18356256, at *5. "The contemnor's disobedience is willful if the 'contemnor had actual notice of the court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply.'" *Id.*

   As stated above, it is evident that Cartwright's violation of the Consent Order was willful. Cartwright appeared in this lawsuit and jointly proposed the terms of the Consent Order, and he clearly had actual notice of the Consent Order when it was entered by the Court. The Consent Order set forth simple and clear terms with which for Cartwright to comply—as relevant to this motion. Cartwright made no effort to seek a modification of the

Consent Order, and as established above, Cartwright deliberately violated the Consent Order. *See* Declaration of Brett E. Lewis ¶ 7 (ECF No. 15).

Because SMP Nutra was forced to initiate this contempt proceeding to stop Cartwright's ongoing violations, attorneys' fees are warranted in this case. Plaintiff will submit supplemental briefing on attorneys' fees should this Court find contempt in Cartwright's conduct and request such briefing.

       d.  <u>Expedited Discovery</u>

In appropriate circumstances, a court has the authority to order discovery where additional facts bearing on a decision are needed. *SmartSky Networks, LLC v. Wireless Sys. Sols., LLC*, 630 F. Supp. 3d 718, 731 (M.D.N.C. 2022) (allowing limited discovery to determine the full extent of any violations to an injunction upon the movant's showing that the defendants were planning to misuse the proprietary information of the movant to develop a competing product). Here, SMP Nutra respectfully submits that it has proffered clear and convincing evidence of Cartwright's violations of the Court Order, warranting a finding of civil contempt and a referral to criminal contempt proceedings. Should this Court disagree, SMP Nutra moves the Court for permission to conduct expedited discovery into Cartwright's violation of the Consent Order. Either way, SMP Nutra seeks expedited discovery into Mr. Simon's role in aiding and abetting such violations.

SMP Nutra further requests that the Court order Cartwright to place his electronic devices and accounts on a discovery hold, to preserve all files and data for forensic inspection, and to turn over such devices and/or accounts promptly at a court-scheduled time and date for the said inspection. *See In re EZ Pay Servs., Inc.*, 390 B.R. 445, 456 (Bankr. M.D. Fla. 2008) (finding evidence, a letter distributed in violation of a TRO, from forensic inspection of the defendant's device which contradicted the defendant's contention that she did not authorize or remember such a letter).

18

### B. Criminal Contempt

A trial court ordinarily first applies the coercive remedy of civil contempt and makes use of the criminal contempt when the disobedience continues, but the "refusal to obey a court order may subject a person to both civil and criminal contempt for the same acts." *Leadsinger, Inc. v. Cole*, No. 05 CIV. 5606(HBP), 2006 WL 2266312, at \*22 (S.D.N.Y. Aug. 4, 2006). To hold a defendant in criminal contempt, it must be proven beyond a reasonable doubt "that (1) the court entered a reasonably specific order; (2) defendant knew of that order; (3) defendant violated that order; and (4) his violation was willful." *Id.* at \*23 (citing *United States v. Cutler*, 58 F.3d 825, 834 (2d Cir.1995)). The "willfulness" element requires a showing of "a specific intent to consciously disregard an order of the court." *United States v. Lynch*, 162 F.3d 732, 735 (2d Cir.1998).

To adhere to the due process requirement under the Federal Rule of Criminal Procedure 42(a), Plaintiff respectfully requests the Court refer this matter to the United States Attorney's Office for the Eastern District of New York for investigation and, if the United States Attorney deems it appropriate, prosecution. *Leadsinger, Inc.*, 2006 WL 2266312, at \*23 (citing Fed. R. Civ. P. 42(a)—"The Court must give the alleged contemnor 'notice in open court' of the prosecution, and the notice must include 'the essential facts constituting the charged criminal contempt.'").

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that this Court hold Cartwright in civil contempt, refer this matter to the United States Attorney's Office for the Eastern District of New York, and to grant the relief requested above.

Dated: January 23, 2024
      Brooklyn, New York

Respectfully submitted,

By: */s/Brett E. Lewis*
Brett E. Lewis, Esq.

LEWIS & LIN LLC
77 Sands St, 6th Floor
Brooklyn, NY 11201
Tel: (718) 243-9323
Fax: (718) 243-9326
Email: Brett@ilawco.com

*Attorneys for Plaintiff*